IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>v.<br><br>DOLEGARIO CARRANZA-<br>ONTIVEROS,<br><br>    Defendant. | CRIMINAL INDICTMENT NO.:<br><br>1:19-CR-155-MLB-JKL-2 |

## FINAL REPORT AND RECOMMENDATION

Defendant Dolegario Carranza-Ontiveros is charged in this case with conspiracy to possess with intent to distribute heroin and cocaine, possession with intent to distribute heroin and cocaine, and possession of a firearm in furtherance of a drug crime. [Doc. 54.] The case is presently before the Court on Defendant's Preliminary Motion to Suppress [Doc. 71], his First Particularized Motion to Suppress Cell Phone Records Search Warrant [Doc. 75], and his First Amended Motion to Suppress [Doc. 97]. In these motions, he moves to suppress (1) evidence and statements he made following what he contends was an unlawful arrest on March 28, 2019, and (2) data (including historical cell-site information) associated

with two cell phones that were in Defendant's possession at that time.[1]  On January 8, 2020, I held an evidentiary hearing on the circumstances of Defendant's March 28 encounter with law enforcement.[2]  [Docs. 82, 86.]  Defendant has filed a post-hearing brief in support his motions [Doc. 98] and the government has filed its response [Doc. 101].  Defendant has not filed a reply, and the time for doing so has passed.  [*See* Doc. 95 (setting deadline of June 22, 2020 to file reply).]

In the discussion below, I first address the motions to suppress evidence and statements and then the motion to suppress cell phone data.  For the reasons that follow, I **RECOMMEND** that the motions to suppress statements and evidence be **GRANTED IN PART AND DENIED IN PART**, and that the motion to suppress cell phone data be **DENIED**.

## I.    SUPPRESSION OF STATEMENTS AND EVIDENCE

In his post-hearing brief, Defendant contends that his encounter with law enforcement on March 28, 2019 was an arrest from its inception, and that as an arrest, it was unlawful because the government failed to establish probable cause.  As a result, he contends that the evidence seized (including cell phones and a gun)

---

[1] The government obtained this data by means of a search warrant directed to T-Mobile.  The warrant and application are docketed at docket entry 103.

[2] Citations to the hearing transcript are: (Tr. at ___).

2

and the un-Mirandized statements he made should be suppressed as fruit of an unlawful arrest.  [Doc. 98 at 5-10.]  The government responds that the encounter was merely an investigatory detention, not a full-blown arrest, and that his detention was supported by a reasonable suspicion that he was engaged in drug activity.   [Doc. 101 at 7-23.]   The government further contends that law enforcement properly seized the cell phones during an initial frisk for weapons; but that even if the seizure violated the Fourth Amendment, the phones and gun should not be suppressed under the inevitable discovery exception to the exclusionary rule. [*Id.* at 30-35.]  Finally, the government argues that Defendant's statements are not subject to suppression because they were not elicited as part of custodial interrogation, but rather, during a legal investigative stop before the right to *Miranda* warnings had attached.  [*Id.* at 24-30.]

A.    Background

In early March 2019, the ATF began a drug investigation of Kemp Broadie, a codefendant in this case.  (Tr. 4.)  The investigation included using a confidential source to purchase drugs from Broadie on March 6 and 20, 2019 (Tr. 85-87), and surveilling his residence in Atlanta (the "Residence") using a pole camera (Tr. 5).

On March 27, 2019, the confidential source arranged a meeting with Broadie for the following afternoon to buy approximately one kilogram each of cocaine and

3

heroin.  (Tr. 3, 88.)  On March 28, in anticipation of the meeting, DEA Special Agent Jim Brown monitored the pole camera video from his car using a mobile phone app (Tr. 8, 28), and beginning around 9:30 or 10:00 in the morning, law enforcement assembled in the neighborhood around the Residence (Tr. 12).

At approximately 8:56 a.m., the pole camera video showed a blue Honda Accord arrive at the Residence and two people—later identified as Defendant and his nephew Hector Mendel—get out of the car and go into the Residence.  (Tr. 29, 89.)  As far as SA Brown knew, none of the agents had seen either the Honda or the two individuals before, and they were unaware of their identities.  (Tr. 29, 89-90.)  At 9:20 a.m., the two individuals exited the Residence with Broadie, and the three of them left in two cars, the blue Honda and a Mercedes that was parked at the Residence.  (Tr. 30-31.)  Agents did not follow or conduct surveillance on the cars after they left.[3]  (*Id.*)

Approximately two hours later, the pole camera video showed Broadie return to the Residence driving the Mercedes and park under a tent in the driveway.  (Tr. 32.)  He exited the car and carried a red backpack into the Residence.  (*Id.*)  The blue Honda returned to the area at the same time as the Mercedes, but it continued

---

[3] There was a ping on Broadie's cell phone at the time.  (Tr. 32.)

4

to drive around for approximately two minutes until it finally parked on the street in front of the Residence.  (Tr. 32-33.)  Due to a technical malfunction, the pole camera video froze for about two-and-a-half minutes after the Honda parked, and agents did not observe anyone exit the Honda or enter the Residence from the Honda.  (Tr. 33.)

At approximately 1:35 p.m., Broadie left the Residence alone carrying a briefcase, got into a Suburban that had been parked on the street outside the Residence since earlier in the morning, and left to meet the confidential source. (Tr. 12, 30, 34-35, 90.)  Shortly thereafter, the Georgia State Patrol ("GSP") pulled him over, seized approximately one kilogram each of heroin and cocaine, and arrested him for possession of controlled substances.  (Tr. 11, 65, 91.)  During the traffic stop, Broadie indicated that there may still be someone inside the Residence. (Tr. 64.)

Meanwhile, DEA agents and GSP troopers assisting with the investigation were stationed around the Residence, waiting for a search warrant to be issued.  (Tr. 11, 17, 24.)  Because the Residence had been identified as a stash house where drugs might be packaged, and there were concerns that someone inside might pose a risk to officer safety or destroy evidence, the agents were instructed that "[i]f

anyone exits the [R]esidence . . .  detain that person, and . . . immediately secure

the [R]esidence pending the warrant."  (Tr. 64-65.)

At 4:02 p.m., SA Brown saw an individual on the pole camera video, later

identified as Defendant, exit the front door of the Residence carrying a small bag

and walk toward the street where the blue Honda Accord was parked.  (Tr. 14-16,

36, 67; Gov't Ex. ("GX") 1A at 4:02:05.[4])  Less than fifteen seconds later, at least

nine unmarked law enforcement vehicles and two GSP cruisers converged on

Defendant from both directions, up and down the street.  (GX-1A at 4:02:19-42.)

Two plainclothes agents got out of their vehicles and approached Defendant with

their guns drawn and pointed at him.  (Tr. 16-17; GX-1A at 4:02; GX-4 at 0:00:14-

0:00:23; GX-5 at 0:00:08.[5])  Defendant dropped the black bag, raised his hands

(which were empty), got face down on the ground in the street, and placed his hands

behind his back.  (Tr. 57-58; GX-4 at 0:00:15-:22.)

---

[4] When citing to specific portions of the pole camera video that was admitted into evidence as Government's Exhibit 1-A during the January 2020 evidentiary hearing, the Court cites the timestamp in the upper left corner of the picture.

[5] When citing to specific portions of GSP Trooper Jordan Ennis's dashcam and bodycam videos that were admitted into evidence as Government's Exhibits 4 and 5, respectively, the Court cites the elapsed time reflected in the software used to view the video.

Seconds later, Trooper Ennis got out of his car and approached Defendant who was still lying face-down on the ground in the street with his hands behind his back.[6]  (Tr. 45, 49, 58; GX-5 at 0:00:05.)   He handcuffed Defendant and then reached into Defendant's pockets, pulling out a cell phone from his front right pants pocket, a second cell phone from his right jacket pocket, and receipts and money from Defendant's left pants pocket.  (Tr. 49, GX-5 at 0:00:27-:49.[7])  Trooper Ennis placed the items on the ground next to Defendant; he did not search the phones or read the receipt, nor did he search the bag that Defendant had dropped.  (Tr. 50, 55-56.)  According to Trooper Ennis, he searched Defendant to ensure that Defendant did not have a weapon on him and to separate Defendant from his cell phone to prevent Defendant from using it to alert someone inside the Residence who might pose a safety threat.  (Tr. 53.)

After the search was complete, Trooper Ennis stood Defendant up and walked him toward an agent's truck, leaving Defendant's belongings on the

---

[6] Trooper Ennis testified that as he approached Defendant, he "[h]ad him lay down on the ground"; however, it appears from the video that Defendant was already on the ground with his hands behind his back when Trooper Ennis approached him.  (Compare Tr. 49, 59, with Tr. 57 and GX-5 at 0:00:05.)

[7] It appears from the video that Trooper Ennis may have also pulled out a third cell phone from Defendant's left pants pocket.

ground.  (Tr. 49-50.)  Trooper Ennis did this so that the agents could keep an eye on him and to keep him separate from his belongings.  (Tr. 54.)  Special Agent Thomas Jackson, leader of the DEA team, then approached Defendant and asked if there was anyone else in the Residence.  (Tr. 60, 62, 67.)  Defendant responded that one person, his nephew, remained inside.  (Tr. 67-68.)

At approximately 4:03, a minute or two after Defendant exited, agents formed a line (referred to as a "stack") and entered the Residence to clear it of anyone who may be inside.  (Tr. 17, 68; GX-1A at 4:03.)  During the sweep, agents encountered Defendant's nephew, Mendel, in the kitchen area.  (Tr. 21.) Approximately five minutes later, the agents emerged from the Residence to await the issuance of the search warrant.  (Tr. 20.)

After the sweep had ended, SA Jackson started working on a personal history report (known as a "DEA 202") to enable the agents to check for outstanding warrants on Defendant.  (Tr. 69-70.)  At approximately 4:10, SA Jackson walked Defendant—who was still handcuffed and seated near an agent's truck where Trooper Ennis had placed him—toward the front of the Residence.  (Tr. 72; GX-1A at 4:10:45.)  SA Jackson asked Defendant if he had identification.  (Tr. 73.) Defendant responded, "yeah, it's in my bag," or words to that effect.  (Tr. 73, 96.)

8

At approximately 4:12, SA Jackson went to his vehicle to get evidence bags, and then went to the area where Trooper Ennis had first encountered Defendant and found the bag that Defendant had dropped.  (Tr. 75-76, 77.)  SA Jackson opened the bag looking for identification, and immediately discovered a handgun.  (Tr. 76.) He asked other team members to secure the gun and place it into an evidence bag. (Tr. 77.)  SA Jackson continued to look inside the bag, and found Defendant's wallet, which contained Defendant's Georgia driver's license.  (Tr. 77, 78.)

Less than ten minutes later, at 4:20 p.m., United States Magistrate Judge Christopher C. Bly issued a search warrant for the Residence.  (Tr. 22.)  At 4:29, the agents at the Residence learned that the warrant had been signed.  (Tr. 22.) Upon learning that the warrant had been issued, the agents searched the Residence and, following the search, officially arrested Defendant.  (Tr. 80.)

**B.      Discussion**

**1.      Defendant's Seizure of Defendant Was an Arrest.**

Defendant's challenge is, essentially, a fruit-of-the-poisonous tree argument. He contends that his initial seizure was a full-blown arrest for which there was no probable cause, and that this illegality tainted the later seizure of the phones and gun.  [Doc. 97 at 1-2; *see also* Doc. 98.]  He also contends—though the argument is not well-developed—that statements he made should be suppressed because they

9

were the "direct result of his illegal seizure and without any *Miranda* warnings." [Doc. 97 at 2.]  The undersigned agrees in part.

The Fourth Amendment prohibits "unreasonable searches and seizures." U.S. Const. Amend IV.  Generally speaking, any evidence that is obtained as a result of an unreasonable (and therefore unconstitutional) search or seizure is not admissible as evidence in court.  *Mapp v. Ohio*, 367 U.S. 643, 654-55 (1961).  The Fifth Amendment, meanwhile, prevents the government from compelling a defendant to provide self-incriminating information, U.S. Const. amend V., and pursuant to the Supreme Court's decision in *Miranda v. Arizona*, 384 U.S. 436, 444 (1966), the government may not use statements made during a period of custodial interrogation unless police used "procedural safeguards effective to secure the privilege against self-incrimination."  But even if a statement is otherwise voluntary for Fifth Amendment purposes, it may still be suppressed under the Fourth Amendment if the statement was the result of an unreasonable seizure.  *See Dunaway v. New York*, 442 U.S. 200, 217-18 (1979); *see also Florida v. Royer*, 460 U.S. 491, 501 (1983) ("[S]tatements given during a period of illegal detention are inadmissible even though voluntarily given if they are the product of the illegal detention and not the result of an independent act of free will.").

10

Courts "have categorized encounters between police and citizens into three types, with varying levels of Fourth Amendment scrutiny: '(1) police-citizen exchanges involving no coercion or detention; (2) brief seizures or investigatory detentions; and (3) full-scale arrests.'" *United States v. Jordan*, 635 F.3d 1181, 1185 (11th Cir. 2011) (quoting *United States v. Perez*, 443 F.3d 772, 777 (11th Cir. 2006)).  The first category is inapplicable in this case, as there is no dispute that Defendant was at least seized and detained shortly after he left the Residence.  [*See* Doc. 101 at 7-8.]

"With regard to the second category of police-citizen encounters—brief seizures and investigatory detentions, *Perez*, 443 F.3d at 777—the Fourth Amendment does not prohibit a police officer, 'in appropriate circumstances and in an appropriate manner from approaching a person for purposes of investigating possibly criminal behavior even though there is no probable cause to make an arrest," *Jordan*, 635 F.3d at 1185 (quoting *Terry v. Ohio*, 392 U.S. 1, 22 (1968)) (alterations adopted).  In these so-called *Terry* stops, officers "may seize a suspect for a brief, investigatory . . . stop where (1) the officers have a reasonable suspicion that the suspect was involved in, or is about to be involved in, criminal activity, and (2) the stop 'was reasonably related in scope to the circumstances which justified

11

the interference in the first place.'" *Id.* (quoting *Terry*, 392 U.S. at 20).  However, "[w]hen the totality of the circumstances indicate that an encounter has become too intrusive to be classified as a brief seizure, the encounter is an arrest and probable cause is required."  *United States v. Rodriguez*, 762 F. App'x 938, 940 (11th Cir. 2019) (quoting *United States v. Espinosa-Guerra*, 805 F.2d 1502, 1506 (11th Cir. 1986)) (alteration adopted).

    "No brightline test separates an investigatory stop from an arrest."  *United States v. Blackman*, 66 F.3d 1572, 1576 (11th Cir. 1995).  "Instead, whether a seizure has become too intrusive to be an investigatory stop and must be considered an arrest depends on the degree of intrusion, considering all the circumstances."  *Id.*  To differentiate between a *Terry* stop and an arrest, courts consider:  "(1) the law enforcement purpose served by the detention; (2) the diligence with which the officers pursued the investigation; (3) the scope and intrusiveness of the investigation; and (4) the duration of the detention."  *United States v. Street*, 472 F.3d 1298, 1306 (11th Cir. 2006) (citing *United States v. Hardy*, 855 F.2d 753, 759 (11th Cir. 1988)).  "In balancing these factors, [the Court is] to focus on 'whether the police diligently pursued a means of investigation likely to confirm or dispel their suspicions quickly, during which time it was necessary to detain the

12

defendant.'" *Id.* (citations omitted).  If law enforcement exceed the proper scope of a stop, then the search is unreasonable, and the evidence must be suppressed, unless an exception to the exclusionary rule applies.

Turning then to the scope of Defendant's detention,[8] the Court finds that three of the four factors weigh in favor of finding that the detention did not exceed the scope of a *Terry* stop.  The first factor—the law enforcement purpose served by the detention—counsels in favor of the government.  Only two and a half hours before encountering Defendant, the law enforcement officers (1) observed Broadie leave the Residence en route to a pre-arranged controlled purchase (as he had done in connection with earlier controlled purchases), (2) pulled him over, (3) seized distribution quantities of both heroin and cocaine, and (4) were informed by

---

[8] Although Defendant initially challenged the search of his person because it was "without reasonable suspicion" [Doc. 97 at 1], he has explicitly declined to "develop the argument" that reasonable suspicion was lacking [Doc. 98 at 11 n.18]. In any event, reasonable suspicion requires "minimal level of objective justification for making the stop," *Jordan*, 635 F.3d at 1186 (quoting *Illinois v. Wardlow*, 528 U.S. 119, 123 (2000), based on the totality of the circumstances and the collective knowledge of the officers, *United States v. Nunez*, 455 F.3d 1223, 1226 (11th Cir. 2006).  Without belaboring the issue, Court readily concludes that under these circumstances, the agents had reasonable suspicion that Defendant was involved with the drug trafficking when he exited the Residence.  The government, meanwhile, does not argue that probable cause existed to arrest Defendant at that point [*see* Doc. 101 at 13], which requires an objectively reasonable belief that the suspect has in fact committed a crime, *Street*, 472 F.3d at 1305.

Broadie that there might be more people and drugs within the Residence.  So when Defendant exited the house, it was reasonable for the officers to believe that Defendant might have had a role in the drug trafficking operation and that the bag he was carrying may have contained contraband.  It was also reasonable that the officers would be concerned that someone inside the house might destroy evidence or pose a safety risk if he became aware of law enforcement's presence outside the house.  As a result, the officers had legitimate reasons for detaining Defendant.

The second factor—the diligence with which law enforcement pursued the investigation—also counsels in favor of finding that Defendant's seizure was an investigatory stop rather than a full-scale arrest.   When the officers first encountered Defendant, they were in the process of obtaining a warrant to search the Residence.  After Defendant was secured, but before receiving the warrant, the officers entered the Residence to conduct a sweep to make sure that there were no other individuals in the Residence who could pose a threat or destroy contraband. SA Jackson also worked quickly to complete a personal history report on Defendant and check for outstanding warrants.  (Tr. 69-71.)

The fourth factor—the duration of the detention—also supports a finding that Defendant was detained rather than arrested.  There is no bright-line test for

how long an investigatory detention may last until it becomes a *de facto* arrest. *Street*, 472 F.3d at 1307. However, given that the agents expected that a search warrant would be issued imminently, Defendant's detention of around thirty minutes was not so long as to transform the purported detention into an arrest. *See United States v. Gil*, 204 F.3d 1347, 1350 (11th Cir. 2000) (investigative detention did not ripen into full arrest where defendant was handcuffed for seventy-five minutes in a police car); *United States v. Hardy*, 855 F.2d 753, 761 (11th Cir. 1988) (investigative stop lasted approximately fifty minutes for a canine unit to arrive).

However, the third factor—the scope and intrusiveness of the investigatory stop—results in a different call. This factor "requires the weighing of the scope and intrusiveness of the detention against police officers' need to ensure their safety, and 'officers may take reasonable steps to ensure their safety so long as they possess an articulable and objectively reasonable belief that the suspect is potentially dangerous." *Rodriguez*, 762 F. App'x at 941 (quoting *Acosta*, 363 F.3d at 1146).

It is well-established that the police can conduct a protective search of a suspect without converting a *Terry* stop into a full-scale arrest. The Eleventh Circuit has explained that:

> When an officer reasonably believes that a suspect threatens his safety or the safety of others, he may search the suspect and seize concealed objects that he reasonably believes may be weapons or other instruments of assault. To frisk a suspect, an officer conducts *a carefully limited search of the outer clothing of the suspect . . . to discover weapons which might be used to assault him*. And if an officer feels a concealed object that he reasonably believes may be a weapon, he may continue the search beyond the outer clothing by searching the suspect's pocket and removing the concealed object.
>
> The sole justification of the search of a suspect is the protection of the police officer and others nearby, so a frisk must remain reasonably related in scope to the circumstances which justified the frisk in the first place. A frisk reasonably designed to discover guns, knives, clubs, or other hidden instruments for the assault of the police officer does not exceed its permissible scope.

*United States v. Johnson*, 921 F.3d 991, 997 (11th Cir. 2019) (emphasis added) (quotation marks omitted; alterations adopted) (citing *Terry*, 392 U.S. at 29, 30, and *United States v. Clay*, 483 F.3d 739, 743-44 (11th Cir. 2007)). Thus, to remain permissible, the frisk "must be strictly limited to that which is necessary for the discovery of weapons which might be used to harm the officer or others nearby." *Minnesota v. Dickerson*, 508 U.S. 366, 373 (1993) (citing *Terry*, 392 U.S. at 26). In determining the reasonableness of a protective search, the court considers the totality of the circumstances, including "the time of day, the location of the scene, the lighting at the scene, the number of officers, and the nature of the alleged crime." *Johnson*, 921 F.3d at 998.

16

As noted above, when Defendant came out the front door of the Residence, marked and unmarked law enforcement vehicles descended upon the Residence, and at least two agents approached Defendant with their guns drawn. Defendant dropped the bag he was carrying and lay face-first on the ground with his hands behind his back. Trooper Ennis arrived on Defendant's person seconds later and handcuffed him. Despite this impressive show of force and Defendant's handcuffing, these steps were justified and, if that were the extent of the encounter, the Court would find that Defendant had been merely detained and not arrested. *See Acosta*, 363 F.3d at 1147 ("[A]n investigatory stop does not necessarily ripen into an arrest because an officer draws his weapon, handcuffs a suspect, [or] orders a suspect to lie face down on the ground.").

But what happened next—Trooper Ennis's search of Defendant's pockets— tips the balance in favor of finding that Defendant's seizure was an arrest for two reasons. First, the testimonial record is wholly undeveloped of evidence to suggest that Trooper Ennis conducted a frisk or pat down **before** placing his hands inside Defendant's pockets. Specifically, at the evidentiary hearing, Trooper Ennis neither described conducting an initial frisk or pat-down, nor stated that he felt something that could be a weapon at any point during the search. Rather, he

17

testified on direct examination that after he handcuffed Defendant, he simply "check[ed] his pockets and remov[ed] the contents" in order "to clear and make sure [Defendant] didn't have any weapons on him." (Tr. 53.) Likewise, on cross examination, Trooper Ennis testified as follows:

> Q. So when you first encountered him, he's face down on the ground, his hands are behind his back, you cuff him behind his back?
>
> A: Correct, yes.
>
> Q. And go into his pockets, correct?
>
> A. Correct, yes.

(Tr. 58.) This testimony reveals nothing allowing the Court to infer that Trooper Ennis conducted a pat-down prior to searching Defendant's pockets, and, instead, appears to support the conclusion that there was no pat-down at all.

Video from Trooper Ennis's body cam (GX-5) indicates that Trooper Ennis may have conducted a limited pat-down, but even then, it is not crystal clear. The video shows that after Trooper Ennis handcuffed Defendant, he rolled Defendant over on his side, placed his hand on the outside of Defendant's right pants pocket (which appear to be sweatpants), and felt a hard rectangular object. Following is an image from Trooper Ennis's body cam footage:

18



Upon feeling the object, Trooper Ennis reached into the pocket and pulled out a cell phone.  Simultaneously, he put his hand into Defendant's right jacket pocket without frisking or feeling around that area first, and pulled out a second phone. Following is an image from the body cam footage showing the simultaneous searches of the pockets:



Trooper Ennis placed both phones on the ground, and then used both hands to feel the outside of Defendant front left pants pocket.  He then put his left hand in the

19

pocket and, while pushing up from the outside with his right hand.  Though difficult to tell from the camera angle, it appears that Trooper Ennis then reached over with his left hand to Defendant's left jacket pocket, near the opening, while also bringing his right hand over to pull the jacket straight and then feel the outside of the left jacket pocket area.  He then reached into the pocket with his left hand and pulled out a third phone.[9]  Having checked and emptied Defendant's pockets, Trooper Ennis finally patted down Defendant's waist and thigh area before picking him up and leading him away.  (GX-5 at 0:00:48.)  Based upon the foregoing, then, it is unclear the extent to which Trooper Ennis frisked the areas around each of Defendant's pockets before reaching into them.

Second, even if Trooper Ennis conducted a pat-down before removing the items from Defendant's pockets, the government has not shown that he reasonably believed that anything he felt might be a weapon (or any "other hidden instruments for the assault of the police officer"), which is generally required before an officer can search beyond the outer clothing and go into a suspect's pocket.  *See Johnson*, 921 F.3d at 997-98 (quoting *Terry*, 392 U.S. at 29); *see also United States v.*

---

[9] The parties refer only to two phones, so it is unclear whether there was, in fact, a third phone or if Trooper Ennis pulled out an item that merely resembled a phone.

*Hunter*, 291 F.3d 1302, 1307 (11th Cir. 2002).  Trooper Ennis never testified that he actually felt something that he believed was a weapon or removed anything from Defendant's pockets because he believed it necessary "to neutralize the threat of physical harm."  *Id.* at 1001 (quoting *Terry*, 392 U.S. at 24).  To the contrary, he testified that he was in part searching for cell phones, since he believed that if Defendant had a cell phone, Defendant could use it to ***indirectly*** endanger the safety of the officers.  Trooper Ennis testified as follows:

> Q. Now again when you say search, can you be clear what was the purpose of that search?
>
> A.  So I wanted to clear and make sure [Defendant] didn't have any weapons on him, and I was checking his pockets and removing the contents from his pockets, and then secured his belongings on the ground, and then I moved him from --
>
> Q.  Beyond looking for weapons, why did you – when you say you cleared the contents or you searched through his pockets, why, what was [the] purpose?
>
> A.   One of the things I wanted to do is I wanted to remove his cellphones because now I know there's another individual in the house and I don't want him to continue to have communication with anybody in the house just in case [he] g[a]ve them a warning that we were coming or have him able to communicate in any way with anybody until the scene is safe.

(Tr. 53.)

In essence, then, the government asks the Court to conclude that Trooper Ennis reasonably believed a cell phone to be a "weapon" under *Terry*. The government, however, cites to no authority in which a court has found that in the context of a *Terry* stop, a cell phone qualified as a weapon.[10]  What constitutes a "weapon" depends on the circumstances of the particular case, but "[t]he sole justification of the search of a suspect is the protection of the police officer and others nearby, so a frisk must remain reasonably related in scope to the circumstances which justified the frisk in the first place." *Johnson*, 921 F.3d at 997 (citing *Terry*, 392 U.S. at 29) (quotation marks omitted; alterations adopted).  The bounds of a frisk depends on a totality of "the concrete factual circumstances of

---

[10] The Court's own research reveals at least one district court that held that a detention became an arrest where a police officer put his hands into a suspect's pocket and removed cell phones knowing that they were not guns or any other type of weapon. *United States v. Johnston*, No. CR 14-50028-JLV, 2014 WL 3573406, at *13 (D.S.D. July 21, 2014).  Another district court similarly found that an officer's seizure of a cell phone from a suspect weighed in favor of find that the suspect was under formal arrest where there was no evidence that the officer believed the phone was a weapon. *United States v. Thomas*, No. 08-CR-87-BBC-02, 2009 WL 151180, at *7 (W.D. Wis. Jan. 20, 2009), *report and recommendation adopted*, 2009 WL 382607 (W.D. Wis. Feb. 2, 2009).  At least one Court in this District has assumed as much. *United States v. Chaidez-Reyes*, 996 F. Supp. 2d 1321, 1336 (N.D. Ga. 2014) (finding that officers exceeded the "carefully circumscribed limits" of a *Terry* stop when a suspect's "cell phone, keys and currency were removed from him . . . [e]ven if he was initially frisked"), *report and recommendation adopted*, *id.* at 1326.

22

individual cases." *Id.* Relevant considerations include, for example, "the time of day, the location of the scene, the lighting at the scene, the number of officers, and the nature of the alleged crime." *Id.*

The Court is reluctant to conclude, on these facts and in the absence of any authority, that the intentional search for and removal of cell phones (as opposed to the search for weapons and removal of cell phones as a byproduct of that search) from Defendant's pockets was reasonably related to the protection of the officers. From almost the beginning of Defendant's encounter with Trooper Ennis—and certainly before Trooper Ennis began searching Defendant's clothing—Defendant was handcuffed with his hands behind his back. Though "[h]andcuffs do not always work, and suspects have been known to reach for weapons even when handcuffed," *see Johnson*, 921 F.3d at 1001, Defendant was not in a position to access any of the cell phones in his pocket in enough time to contact someone in the house to alert the presence of law enforcement.[11] It takes time and some

---

[11] The Court acknowledges that a handcuffed person may be able to use his phone even while restrained. *See Alston v. Swarbrick*, 954 F.3d 1312, 1320 (11th Cir. 2020) (crediting arrestee's testimony for purposes of summary judgment that while handcuffed in the back of a patrol car, he retrieved his cell phone and called his aunt). But, here, the time that it would take to physically or verbally use a phone to call or text someone, and the fact that Trooper Ennis was immediately next to Defendant at the time that agents entered the Residence, counsel against finding

23

modicum of freedom to use a phone to call or text, whether it be dialing a number or sending a text message manually or by voice command.  During the first minute of being handcuffed and his pockets searched, Defendant was in the immediate vicinity of Trooper Ennis and many other law enforcement officers, in broad daylight in the middle of a street, obeying commands to lie down, and one of them would surely have noticed Defendant attempting to use one of the phones.  What's more, even if the initial commotion did not alert the surrounding homes to the presence of law enforcement, while Defendant was handcuffed and next to Trooper Ennis and other officers, at least eight agents had already formed a stack and had begun entering the Residence to perform the protective sweep, so, presumably, whoever might have been inside the house would have known by then that agents were present.  (GX-1A at 4:02:57-4:04:20).  The Court is sympathetic that, in a general sense, agents would have been concerned that Defendant could have used a phone to contact someone inside the house.  But the other steps that the agents took to secure their safety—including handcuffing Defendant, keeping him within the immediate vicinity of agents, and immediately conducting a sweep of the

---

that Defendant's mere possession of the phones presented such a danger that Trooper Ennis reasonably could have been expecting Defendant to use the phone to alert someone inside the Residence.

24

Residence—militate against a finding that Defendant's cell phones posed the same sort of threat to officer safety as would a traditional weapon for physical assault.

To be clear, the Court does not rule out the possibility that, in certain circumstances, a cell phone could pose a sufficient threat of harm to justify its removal during a protective search; however, the Court is not persuaded that the search for and discovery of a cell phone, without more, allowed Trooper Ennis to place his hands inside Defendant's pockets without probable cause. Significantly, Trooper Ennis never testified that in searching Defendant, he understood the cell phones to be any other type of object that could be construed to pose a physical threat to the officers.

In reaching this conclusion, the Court finds the analysis in *Chaidez-Reyes* persuasive. In that case, a suspect's encounter with law enforcement was an arrest, rather than an investigatory detention, where the suspect was searched without first being frisked or patted down. *Chaidez-Reyes*, 996 F. Supp. 2d at 1336. The court further explained that "Even if [the suspect] initially was frisked, the record is completely devoid of testimony that the frisking officer concluded that something he felt on [the suspect'] person was a weapon or otherwise was properly seized under the "plain feel" doctrine recognized in *Minnesota v. Dickerson* . . ." *Id.* The

25

same goes for the case at bar.  To the extent that Trooper Ennis conducted a frisk prior to placing his hands into Defendant's pockets, it appears that it was incomplete, and the record does not indicate that Trooper Ennis reasonably thought that any of the items he felt were objects other than cell phones.  Considering the totality of the circumstances, the Court finds that Trooper Ennis's protective search of Defendant exceeded the permissible scope of a *Terry* stop and ultimately amounted to an arrest, rather than a mere investigatory detention.

### 2. The Evidence Seized is Still Subject to the Inevitable Discovery Exception to the Exclusionary Rule.

Defendant argues that since his seizure was an arrest, his cell phones and the gun recovered from his bag, seized prior to his "formal" arrest (that is, after the agents executed the search warrant and placed him under arrest), must be suppressed as fruit of the poisonous tree.  The government responds that this evidence should not be suppressed under the inevitable discovery exception to the exclusionary rule.  The government has the better of the arguments here.

In general, evidence that the government obtains in violation of the Fourth Amendment must be suppressed.  *United States v. Jordan*, 635 F.3d at 1185.  This exclusionary rule serves the important purpose of deterring police misconduct by preventing the government from introducing evidence obtained through such

26

misconduct. *United States v. Virden*, 488 F.3d 1317, 1322 (11th Cir. 2007) (citing *Nix v. Williams*, 467 U.S. 431 (1984)). But since the rule "sometimes results in the high social cost of allowing guilty persons to go unpunished, it has been tempered with exceptions that apply where the deterrence rationale has little basis." *Id.* "Under the exceptions, the government is left in no worse position than had the police misconduct not occurred." *Id.*

One such exception is inevitable discovery. Under that exception, unlawfully-seized evidence may still be admitted if the government establishes two things by a preponderance of the evidence: (1) that the information would have ultimately been recovered by lawful means and (2) the lawful means which made discovery inevitable were being actively pursued prior to the occurrence of the illegal conduct. *Virden*, 488 F.3d at 1322. To show "active pursuit," "[t]he government must . . . establish that the police would have discovered the evidence by virtue of ordinary investigations of evidence or leads already in their possession." *United States v. Johnson*, 777 F.3d 1270, 1274 (11th Cir. 2015) (quotations omitted).

This is a quintessential inevitable discovery case, as the government has demonstrated both (1) a reasonable probability that the agents would have seized

the cell phones and gun through lawful means and (2) that the agents were actively pursuing the means by which made such discovery inevitable.  By March 28, 2019, agents had developed probable cause to believe that Broadie was using the Residence as a stash house to package drugs, using investigative techniques including surveillance of the Residence using a pole camera and controlled purchases.   On March 28, after agents intercepted Broadie—and *before* they encountered Defendant—they planned to apply for and began the process of obtaining a search warrant for the Residence.  (*See* Tr. 11, 90.)  And although the agents conducted a sweep of the Residence, it is undisputed that they did not search it until after the warrant had been signed.  Thus, it is uncontested that the warrant was actively pursued prior to the questionable search and, just as importantly, their interaction with Defendant and seizure of the cell phones and gun had no bearing on the decision to obtain a search warrant or its execution.

It is also significant that Defendant was not being detained based on anything that was recovered during the search of his person or the bag.  Thus, regardless of whether the phones or gun were recovered, Defendant would have remained seized until after agents searched the Residence.  Since it is undisputed that the agents

developed probable cause to arrest him after the search of the residence,[12] it is a virtual certainty that those items would have been seized upon his arrest.  (Tr. 81.) More specifically, upon being arrested, the agents would have removed any and all items from Defendant's pockets, including the cell phones.  (*Id.*)  As for the bag, the agents would have taken it into custody and performed an inventory prior to securing it.  (*Id.*)  *See also United States v. Rhind*, 289 F.3d 690, 694 (11th Cir. 2002) (even if protective search of bag in defendant's possession was not lawful, "the contents of the bag would nevertheless have been admissible because the officers inevitably would have discovered the evidence in a routine inventory search following [defendant's] arrest").

Accordingly, the Court concludes that even though Defendant's seizure was a full-blown arrest rather than an investigatory detention, all of the evidence seized would still have inevitably been discovered.  It is therefore **RECOMMENDED** that the Court **NOT SUPPRESS** the gun and cell phones.

---

[12] Defendant does not challenge the lawfulness of his arrest after the Residence was searched.  (Tr. 101.)

29

3.   **The Statements that Defendant Made Prior to His "Formal" Arrest Should be Suppressed as Fruit of an Unlawful Arrest**

Defendant also moves to suppress statements he made because "[a]ny questioning of [him] was the direct result of his illegal seizure and without any *Miranda* warnings." [Doc. 97.]  Defendant does not identify with any degree of specificity the statements he challenges, but as best the Court can tell, it appears that Defendant is seeking to suppress (1) his response to SA Jackson's question as to whether there were others in the house and (2) his response to SA Jackson's question as to whether he had identification.  [Doc. 97 at 2; Doc. 94 at 4.]  The government contends that *Miranda* does not attach those statements because Defendant made them in response to routine investigatory questioning prior to formal arrest.[13]  [Doc. 101 at 27-30.]

---

[13] The government points out in its response that Defendant does not challenge the voluntariness of any statements he made or that he knowingly, intelligently, and voluntarily waived his *Miranda* rights following his "formal" arrest.  [Doc. 101 at 23-26.]  Defendant did not file a reply disputing this.  Nor did he explore this issue at the evidentiary hearing, address issues of voluntariness in his post-hearing brief, or file a reply disputing the government's observation in its response brief.  Thus, the undersigned does not reach the voluntariness of any waiver or statements in this report and recommendation.

As a threshold matter, it is important to keep in mind that there are two constitutional rights at issue:  Defendant's Fourth Amendment right to be free from an unreasonable search or seizure and his Fifth Amendment right against self-incrimination.  Defendant does not argue that his Fifth Amendment rights were violated at any point during his encounter with law enforcement on March 28, 2019.  As a result, the Court focuses its inquiry on whether Defendant's statements following his seizure should be suppressed under the Fourth Amendment.[14]

_____

[14] A Fifth Amendment challenge to the statements at issue would likely be futile anyhow.  The Fifth Amendment provides that "[n]o person . . . shall be compelled in any criminal case to be a witness against himself," U.S. Const. amend. V, and in general, a person who is arrested and detained must be given full *Miranda* warnings in order for his statements, made in response to interrogation by a law enforcement officer, to be used against him in court, *United States v. Ochoa*, 941 F.3d 1074, 1096 (11th Cir. 2019), *cert. denied,* 206 L. Ed. 2d 488 (Mar. 23, 2020) (citing *New York v. Quarles*, 467 U.S. 649, 654 (1984)).  Defendant's response to SA Jackson's question about whether there were others inside the Residence likely falls within the public safety exception, which "allows law enforcement officers to question a suspect without first informing him of his *Miranda* rights when they reasonably believe doing so is necessary to protect either the officers or the public." *Id.* at 1096-97.  Given the pole camera footage showing three individuals entering and exiting the Residence on March 28, Broadie's statement that there was at least another person in the Residence, and the fact that the Residence was a known stash house, it was reasonable for SA Jackson to be concerned about another person in the Residence who could pose a threat to the agents' safety.  *Id.*; *see also United States v. Newsome*, 475 F.3d 1221, 1225 (11th Cir. 2007).  Likewise, SA Jackson's asking Defendant whether he had identification likely falls under the exception for "routine booking" information, as this question was designed to obtain information for purposes of processing Defendant's detention.  *United States v. Sweeting*, 933

Turning to that analysis, it is well-settled that the exclusionary rule applies to verbal statements. Thus, where a suspect has been arrested without probable cause and makes a confession, "well-established precedent requires suppression of the confession unless that confession was 'an act of free will [sufficient] to purge the primary taint of the unlawful invasion.'" *Kaupp v. Texas*, 538 U.S. 626, 632 (2003) (quoting *Wong Sun v. United States*, 371 U.S. 471, 486 (1963)). The government bears the burden of "[d]emonstrating such purgation." *Id.* (citing *Brown v. Illinois*, 422 U.S. 590, 604 (1975)); *see also United States v. Santa*, 236 F.3d 662, 677 (11th Cir. 2000). "Relevant considerations include observance of *Miranda*, '[t]he temporal proximity of the arrest and the confession, the presence of intervening circumstances, and, particularly, the purpose and flagrancy of the official misconduct.'" *Kaupp*, 538 U.S. at 632 (quoting *Brown*, 422 U.S. at 603-04)); *see also Utah v. Strieff*, 136 S. Ct. 2056, 2062 (2016).

---

F.2d 962, 965 (11th Cir. 1991) ("An officer's request for "'routine' information for booking purposes is not an interrogation under *Miranda*, even though that information turns out to be incriminating."); *cf. United States v. Sandoval*, No. 1:05-CR-399-BBM-GGB, 2005 WL 8164430, at *1 (N.D. Ga. Nov. 8, 2005), *report and recommendation adopted by oral order*, No. 1:05-CR-399-BBM-GGB (N.D. Ga. Jan. 26, 2006).

The government argues that the exclusionary rule does not apply to Defendant's statements because Defendant's initial seizure was a lawful detention, and not a full-scale arrest. [Doc. 101 at 26 ("As the detention was lawful, any statements made as a result of that detention should not be suppressed.").] Since there was no Fourth Amendment violation, the government maintains, the exclusionary rule does not even come into play. But as discussed above, the circumstances of Defendant's initial seizure indicate that he was arrested, and the government does not make an alternative argument as to how Defendant's statements escape the exclusionary rule if the initial detention were unconstitutional. As a result, the Court cannot find that the government—which bears the burden of persuasion to show that these statements are otherwise admissible—has made a sufficient showing that Defendant's statements to SA Jackson are not tainted as fruit of the poisonous tree.

In reaching this decision, the Court reiterates that both the record and the parties' argument in this regard are limited, and the undersigned's analysis constrained as a result. Also, while not raised by the government, it seems unlikely that either statement would be used at trial. Nonetheless, the Court must **RECOMMEND** that the Court **SUPPRESS** Defendant's responses to SA

33

Jackson's questions as to whether there was someone else inside the Residence and whether he had identification.  The Court does not, however, recommend that any later statements be suppressed, as Defendant has not sought suppression of statements he made after he was arrested and *Mirandized* following the execution of the search warrant.  (*See* Tr. 100-01.)

## II.    SUPPRESSION OF CELL PHONE DATA

In his post-hearing brief, Defendant separately moves to suppress historical cell-site information that the government obtained from T-Mobile pertaining to two of the cell phones that were seized from him on March 28, 2019, on the grounds that the warrant was not supported by probable cause.  [Doc. 75; Doc. 98 at 12-15.] The Court summarizes the supporting affidavit of DEA Task Force Officer Kenneth W. Harmon Jr.[15] (which is largely repetitive of the statement of facts outlined in Part I.A. above), and for the reasons stated below, finds that Defendant's motion to suppress is due to be denied.[16]

---

[15] Officer Harmon's affidavit, along with the warrant application, has been filed at docket entry 103-1.  Citations to the affidavit are: (Harmon Aff. ¶ __).

[16] In his initial motion to suppress information seized from T-Mobile, Defendant also argued that the warrant "is unconstitutionally overbroad [and] thus lacks the requisite particularity required by the Fourth Amendment."  [Doc. 75 at 2.]  Defendant, however, does not develop that argument in his post-hearing brief and focuses solely on whether the warrant was supported by probable cause.  [Doc.

## A.   Background

On June 5, 2019, Officer Harmon applied for and obtained a federal search warrant directed to T-Mobile for, *inter alia*, historical cell site information for two of the cell phones that agents seized from Defendant for the time period of March 28, 2019 through March 29, 2019.[17]  [Doc. 103-1 (application and affidavit); Doc. 103-2 (search warrant).]  In support of the application, Officer Harmon provided a 16-page affidavit in which he detailed his training and experience, how cellular telephones and cell site data work, and how cell phone companies like T-Mobile collect and retain information about their subscribers.  (Harmon Aff. ¶¶ 1-13.)  In the section of the affidavit titled "Probable Cause Basis," Officer Harmon related information about the DEA's drug investigation of Broadie, including how agents first became aware of Broadie, their use of a confidential source to conduct controlled drug buys from him, his use of a cell phone in connection with the

---

98 at 12-15.]  Accordingly, the Court deems the argument abandoned and does not address it further.

[17] The warrant and application refer to Defendant's cell phones as "Subject Telephone #2" and "Subject Telephone #3."  The warrant also authorized a search of information related to a third cell phone, allegedly used by Broadie, which is referred to in the warrant and application as "Subject Telephone #1."  [*See* Doc 103-1; Doc. 103-2.]  As noted above, Trooper Ennis's bodycam video appears to show that he removed three phones from Defendant's pockets; however, only two those phones were the subject of the warrant.

alleged transactions, his arrest, and the seizure of his cell phone (that is, Subject Telephone 1). (*Id.* ¶¶ 14-32.) Officer Harmon also described how on March 27, 2019, the confidential source contacted Broadie to arrange to purchase a kilogram of heroin and a kilogram of cocaine, and how Broadie responded that he had the heroin but would need to pick up the cocaine before the deal. (*Id.* at 26.)

Officer Harmon then related how law enforcement first became aware of Defendant. Specifically, he stated that on March 28, 2019, agents reviewing pole camera footage observed Defendant and Mendel[18] arrive at the Residence in a blue Honda Accord at approximately 8:56 a.m., get out of the car, and approach the Residence. (Harmon Aff. ¶ 27.) He also stated that Defendant was carrying a black shoulder bag. (*Id.*) According to Officer Harmon, at approximately 9:20 a.m., Defendant, Broadie, and Mendel left the Residence; Broadie was carrying a dark-colored plastic bag; Broadie and Defendant got into a Mercedes and left the area; and Mendel followed them in the blue Accord. (*Id.* ¶ 28.) Officer Harmon explained that law enforcement did not follow either vehicle after it left the area, and there were no agents conducting in-person surveillance at the Residence at the

---

[18] Mendel's last name is spelled "Medel" in Officer Harmon's affidavit. The Court uses the spelling in the transcript of the evidentiary hearing for the sake of consistency.

time; thus, "the whereabouts of the three subjects after leaving [the Residence] until they returned approximately two hours later remains unknown." (*Id.* ¶ 29.)

Officer Harmon also related that around two hours later, the Mercedes and Honda returned to the Residence. (Harmon Aff. ¶ 30.) Broadie parked the Mercedes and walked inside carrying a red backpack over his shoulder. The Honda then parked, but, due to the technical glitch, the pole camera did not capture who was in the Honda or if they went inside the Residence. (*Id.*) Officer Harmon stated that at approximately 1:35 p.m., agents observed Broadie leave the residence carrying a briefcase, and he described how Broadie was pulled over and approximately 800 grams of heroin and one kilogram of cocaine were seized. (*Id.* ¶ 32.)

Officer Harmon then stated that at approximately 4:02 p.m., as Defendant exited the house and walked towards the blue Honda, agents "detained" Defendant and discovered Subject Telephones 2 and 3 in his possession. (Harmon Aff. ¶ 33.) He related that agents then secured the Residence and found Mendel in the kitchen area of the home. Agents also observed, in plain view in the living area, the red backpack that Broadie had carried into the Residence earlier that day. According to Officer Harmon, the backpack contained approximately three kilograms of a

substance that tested positive for cocaine and, throughout the house, agents found additional cocaine, heroin, a hydraulic cocaine press, bottles of adulterant, and packaging materials. (*Id.*)

Next, Officer Harmon explained that historical cell site information (among other records) would further the drug investigation because they would show the location of the phones on March 28, 2019, between 9:20 a.m., when Defendant, Mendel, and Broadie left the Residence, and 11:20 a.m., when they returned. (Harmon Aff. ¶ 34.) He wrote, "The whereabouts of the subjects during this time period is relevant to the investigation as [Broadie's] conversations with the [confidential source] on March 27, 2019 reveal that he did not have the cocaine needed to fulfill the [confidential source's] order and that he planned to go get it (from an unknown location) . . . ." (*Id.*) He additionally explained:

> The next morning, on March 28, 2019, [Mendel] and [Defendant] arrived at [Broadie's] residence and all three subjects left minutes later. Once they returned at approximately 11:20 a.m., agents observed the red backpack, which was later found to contain cocaine, in [Broadie's] hand. Within thirty minutes of returning to the residence, the [confidential source] asked if [Broadie] had acquired the cocaine, and [Broadie] responded that he had picked up the cocaine that morning . . . . The requested records are expected to show where the **Subject Telephones**, which were found in the possession of [Broadie] and [Defendant] were located during the two-hour window when [Broadie] picked up the cocaine.

(*Id.*)

38

## B.     Discussion

Defendant argues that Officer Harmon's affidavit fails to establish probable cause to search for information related Defendant's cell phones because "there is no individualized suspicion that [Defendant's] phones were used – other than that lent by proximity and timing." [Doc. 98 at 14.]

A judicial officer considering an application for a search warrant must make a practical, common-sense decision whether, given all the circumstances set forth in the affidavit before him or her, there is a fair probability that contraband or evidence of a crime will be found in a particular place. *Illinois v. Gates*, 462 U.S. 213, 238 (1983). A supporting "affidavit should establish a connection between the defendant and the [place] to be searched and a link between the [location] and any criminal activity." *United States v. Martin*, 297 F.3d 1308, 1314 (11th Cir. 2002). "[T]he task of a reviewing court is not to conduct a *de novo* determination of probable cause, but only to determine whether there is substantial evidence in the record supporting the magistrate judge's decision to issue the warrant." *United States v. Bushay*, 859 F. Supp. 2d 1335, 1379 (N.D. Ga. 2012) (citing *Massachusetts v. Upton*, 466 U.S. 727, 728 (1984)). As a result, "[c]ourts reviewing the legitimacy of search warrants should not interpret supporting affidavits in a hypertechnical manner; rather, a realistic and commonsense

approach should be employed so as to encourage recourse to the warrant process and to promote the high level of deference traditionally given to magistrates in their probable cause determinations." *United States v. Miller*, 24 F.3d 1357, 1361 (11th Cir. 1994) (citing *Gates*, 462 U.S. at 236-37, and *United States v. Ventresca*, 380 U.S. 102, 109 (1965)).

Applying these standards here, the Court readily concludes that viewing Officer Harmon's affidavit in totality, it establishes probable cause to believe that data—including historical cell site information—associated with Defendant's phones constituted evidence of criminal activity in violation of 21 U.S.C. §§ 841 and 846 (*i.e.*, possession with intent to distribute controlled substances and conspiracy to commit the same). The affidavit establishes that on March 27, 2020, Broadie told the confidential source he would need to acquire cocaine for their anticipated drug deal the following day; and that on the morning of March 28, Defendant and Mendel met Broadie at the Residence, they all left the Residence together shortly thereafter (with Broadie and Defendant riding together) and went to an unknown location, Broadie returned two hours later followed by the car that Defendant and Mendel had been spotted in earlier, Broadie carried a red bag into the Residence that contained three kilograms of cocaine, and Defendant and

Mendel were inside the house with the backpack and other indicia of drug trafficking.  It is therefore reasonable to believe that Defendant was involved in the trafficking of drugs and that the phones that were in his possession that day would contain data about the location or locations to which they traveled during the morning of March 28, presumably to retrieve additional cocaine for the drug transaction that afternoon.

Accordingly, it is **RECOMMENDED** that Defendant's First Particularized Motion to Suppress Cell Phone Records Search Warrant be **DENIED**.

## III.   CONCLUSION

For all the reasons explained above, it is **RECOMMENDED** that Defendant's Preliminary Motion to Suppress [Doc. 71] and his First Amended Motion to Suppress [Doc. 97] be **GRANTED IN PART AND DENIED IN PART**.  In particular, it is recommended that the Court suppress only Defendant's responses to SA Jackson's questions as to (1) whether there were others in the house and (2) whether he had identification Defendant, but that the motions be **DENIED** in all other respects.

It is **FURTHER RECOMMENDED** that Defendant's First Particularized Motion to Suppress Cell Phone Records Search Warrant [Doc. 75] be **DENIED**.

I have now ruled on all pretrial matters referred to me with respect to this defendant.  Accordingly, this case is **CERTIFIED READY FOR TRIAL** as to Defendant Carranza-Ontiveros.

**IT IS SO RECOMMENDED** this 13th day of July, 2020.

_____
JOHN K. LARKINS III
United States Magistrate Judge