## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

United States of America,

v.                                             Case No. 1:19-cr-00155

Dolegario Carranza-Ontiveros,        Michael L. Brown
                                              United States District Judge

                              Defendant.

_____/

## <u>OPINION & ORDER</u>

The United States charged Defendant Dolegario Carranza-Ontiveros with conspiracy to possess with intent to distribute heroin and cocaine, possession with intent to distribute heroin and cocaine, and possession of a firearm in furtherance of a drug crime. (Dkt. 54.) Defendant Carranza-Ontiveros moved to suppress evidence collected during what he contends was an unlawful arrest; statements he made during this allegedly unlawful arrest; and cell-site information data from two cellphones in his possession at the time of his arrest. (Dkts. 71; 75; 97.) Magistrate Judge Larkins held an evidentiary hearing and heard testimony from special agents and other law enforcement officers involved in the March 28, 2019, incident. (Dkts. 82; 86.) He issued a

Final Report and Recommendation ("R&R"), saying this Court should deny the motion to suppress the evidence, grant the motion to suppress the statements, and deny the motion to suppress the cellphone data. (Dkt. 107.)  The Court adopts his recommendations in part and denies each of Defendant's motions.

## I.   Background

In early March 2019, law enforcement began a drug investigation into Kemp Duane Broadie, a codefendant in this case.  (Dkts. 86 at 4:6–7; 107 at 3.)  The investigation involved using a confidential source to make a controlled buy from Broadie and a pole camera (essentially a disguised video camera on a utility pole) to surveil his house.  (Dkts. 86 at 4:15–16; 107 at 3.)

The confidential source arranged a meeting with Broadie to buy a kilogram each of cocaine and heroin.  (Dkt. 107 at 3–4.)  In anticipation of this buy, DEA agents closely monitored the surveillance video of Broadie's home beginning on the morning of March 28, 2019.  (*Id.* at 4; Dkt. 86 at 6:9–11.)  A little before 9 a.m., the camera showed two people (later identified as Defendant Carranza-Ontiveros and his nephew Hector Mendel) arrive at the residence and go inside.  (Dkt. 107 at 4.)

Twenty minutes later, Defendant and his nephew exited the house with Broadie and left in two separate vehicles.  (*Id.*)

A few hours later, Broadie returned as did the other vehicle.  The camera caught Broadie entering the residence.  Due to a technical malfunction with the camera, however, agents did not observe anyone exit the other vehicle (the car Defendant presumably was driving) or enter the residence. (Dkts. 86 at 28:7–9; 107 at 5.)

Later that afternoon, Broadie left the house, alone, carrying a briefcase.  (Dkt. 86 at 34:9–11.)  Police apprehended him shortly thereafter and seized approximately a kilogram each of heroin and cocaine. (*Id.* at 65:9–12.)  During the traffic stop, Broadie said someone else might still be in his house.  (Dkt. 107 at 5.)  Meanwhile, officers monitored the house with instructions to apprehend and detain anyone who left it because they believed the home was being used as a stash house to store and package drugs.  (*Id.*)  At the time, officers were awaiting the issuance of a search warrant for the house. (*Id.*)

Around 4:00 p.m., Defendant exited the front door of the house, carrying a small black bag.  Almost immediately, at least nine unmarked police cars and two state police cruisers swarmed Defendant from both

directions.   (*Id.* at 6.)   Cornered by two plainclothes agents who approached Defendant with their guns drawn, Defendant dropped the black bag, raised his hands, laid face down on the ground, and placed his hands behind his back.  (*Id.*)

Trooper Ennis then approached Defendant as he laid on the ground and handcuffed him.   (Dkts. 83-2, Ex. 5 at 0:00:05; 107 at 7).   Ennis reached into Defendant's pockets, pulling one cellphone from his pants pocket and a second cellphone from his jacket pocket.  (Dkts. 83-2, Ex. 5 at 0:00:27–:49; 107 at 7.)   Ennis did not search the phones or the bag Defendant dropped, but placed them on the ground next to Defendant. (Dkt. 107 at 7.)  He then walked Defendant over to an agent's vehicle so officers could keep an eye on him and separate him from his belongings. (*Id.* at 7–8.)  During the encounter, Special Agent Thomas Jackson asked Defendant if anyone else remained in the house, and Defendant said his nephew was still inside.  (*Id.* at 8.)[1]

---

[1] The Magistrate Judge concluded Special Agent Jackson asked this question ***after*** Trooper Ennis searched Defendant's pockets.   As discussed below, bodycam footage shows he asked the question ***before*** the search.

Agents entered the house to clear it of anyone inside, including Defendant's nephew.  (*Id.*)  After conducting the protective sweep, agents exited the house to await the issuance of the search warrant.  (*Id.*)

SA Jackson then started working on a personal history report to determine whether Defendant was the subject of any outstanding warrants.  (Dkts. 86 at 70:2–5; 107 at 8.)  To do this, he asked Defendant if he had any identification.  (Dkts. 86 at 73; 107 at 8.)  Defendant said it was in his bag.  (Dkt. 107 at 8.)  SA Jackson walked to where Defendant had dropped his small black bag, opened it, and discovered a handgun.  (Dkts. 86 at 76; 107 at 9.)

Less than ten minutes later, Magistrate Judge Bly issued a search warrant for the house.  (Dkt. 107 at 9.)  Ten minutes after that, the agents learned of the warrant and executed it.  Following the search, agents officially arrested Defendant.  (Dkts. 86 at 80:3–20; 107 at 9.)

Agents subsequently applied for and obtained a search warrant for historical cell site information for the two phones agents had seized from him.  (Dkt. 103.)  The agents were specifically interested in the period between March 28 and March 29, 2019.  (Dkt. 103-1 at 18.)  Officer Kenneth Harmon, who swore out the affidavit, stated that law

enforcement sought this particular information to learn the possible pickup location for Broadie's drug purchase on the morning of the controlled buy and Defendant's arrest. (Dkts. 103-1 at 19, ¶ 29; 107 at 36–37.)

Defendant contends police unlawfully arrested him and thus seeks to suppress the statements he made, the evidence collected from his pockets, and the gun found in his bag. (Dkts. 97; 71.) He also seeks to suppress the cell site location data collected on the grounds that the search warrant was not supported by probable cause. (Dkt. 75.)

The Magistrate Judge concluded that, although Defendant's seizure was an improper arrest rather than an investigatory detention, law enforcement would inevitably have seized the cell phones and gun. He thus recommended denial of the motion to suppress those items. (Dkt. 107 at 29.) At the same time, he recommended suppression of Defendant's statement to police as fruit of the unlawful initial detention. (*Id.* at 33.) Finally, he concluded probable cause supported the search warrant for the cellphone location data and recommended denial of that motion. (*Id.* at 40–41.) Both the government and Defendant objected to the Magistrate Judge's recommendations. (Dkts. 111; 112.) After a de

6

novo review, the Court overrules Defendant's objections, sustains the government's objections, and adopts in part the R&R.

## II.   Legal Standard

After conducting a careful and complete review of the findings and recommendations, a district judge may accept, reject, or modify a magistrate judge's report and recommendation.  28 U.S.C. § 636(b)(1); Fed. R. Crim. P. 59; *Williams v. Wainwright*, 681 F.2d 732, 732 (11th Cir. 1982) (per curiam).  A district judge "shall make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made." 28 U.S.C. § 636(b)(1).  The district judge should "give fresh consideration to those issues to which specific objection has been made by a party."  *Jeffrey S. v. State Bd. of Educ. of Ga.,* 896 F.2d 507, 512 (11th Cir. 1990) (citation omitted).  For those findings and recommendations to which a party has not asserted objections, the court must conduct a plain error review of the record. *United States v. Slay*, 714 F.2d 1093, 1095 (11th Cir. 1983).

Parties filing objections to a magistrate judge's report and recommendation must specifically identify those findings to which they object.   *Marsden v. Moore*, 847 F.2d 1536, 1548 (11th Cir. 1988).

"Frivolous, conclusive, or general objections need not be considered by the district court." *Id.* The Court has conducted a de novo review of Defendant's motions to suppress.

## III.  Analysis

Defendant claims the Magistrate Judge erred in two ways.  First, he objects to the conclusion that law enforcement officers would have inevitably discovered the gun and phones.  (Dkt. 111 at 5.)  Next, he objects to the conclusion that it was reasonable to believe Defendant was involved in drug trafficking and so the phone records would show pertinent locations of criminal activity.  (*Id.* at 11.)  The government objects to the R&R's conclusion that Defendant's statements were fruit of the poisonous tree and so must be suppressed.  (Dkt. 112 at 18.)

### A.  Motions to Suppress Physical Evidence and Statements  (Dkts. 71; 97)

#### 1.  Evidence Seized from Defendant Carranza-Ontiveros's Pockets and Bag

After careful consideration, the Magistrate Judge concluded that, in weighing the totality of the circumstances, "Trooper Ennis's protective search of Defendant exceeded the permissible scope of a *Terry* stop and ultimately amounted to an unlawful arrest, rather than a mere

investigatory detention." (Dkt. 107 at 9–26.)  He came to this conclusion based on Trooper Ennis's emptying of Defendant's pockets, which the Magistrate Judge concluded "tip[ped] the balance in favor of finding that Defendant's seizure was an arrest" without probable cause.  (*Id.* at 17.) Neither party specifically objects to this conclusion.[2]  The Courts sees no error in the Magistrate Judge's analysis and adopts it.

The R&R next concluded that, due to Defendant's unlawful arrest, the evidence seized should typically be suppressed under the exclusionary rule.   He recommended, however, that it was still admissible under the inevitable discovery exception.  (Dkt. 107 at 26.) Defendant objects, arguing discovery of neither the phone nor the gun was inevitable.  (Dkt. 111.)  The Court disagrees, however, and adopts the Magistrate Judge's conclusion that "[t]his is a quintessential inevitable discovery case."  (Dkt. 107 at 27.)

After considering the record de novo, the Court finds the government has demonstrated both (1) a reasonable probability that the

---

[2] Although the government states that it objects to this conclusion, it provides no meaningful argument in support.  The government likewise drafted its objections with the assumption for the sake of argument that Trooper Ennis's actions exceeded the scope of a *Terry* stop. (*See* Dkt. 112 at 3, 4, 5, 10.)

agents would have seized the cellphones and gun through lawful means and (2) that the agents were actively pursuing the means by which discovery was inevitable.  At the time of Defendant's unlawful detention, the investigating agents were already in the process of applying for and securing a search warrant for the stash house.  They were thus actively pursuing lawful means of discovering the evidence they ultimately seized.  It is also undisputed that the agents developed probable cause to arrest Defendant Carranza-Ontiveros during their investigation.[3]  It is thus not only reasonably probable that agents would have seized the phone and gun upon his arrest, but a "virtual certainty" that they would have.  (*See* Dkt. 107 at 29.)  The Court agrees with the Magistrate Judge that "upon being arrested, the agents would have removed any and all items from Defendant's pockets, including the cellphones.  As for the bag, the agents would have taken it into custody and performed an inventory prior to securing it."  (*Id.*)

---

[3] Defendant did not challenge the legitimacy of his arrest after execution of the search warrant or argue that law enforcement lacked probable cause to arrest him at that time.  He merely argued that he was, in fact, arrested earlier in the encounter when agents first detained him.  (Dkt. 86 at 101.)

As the government points out in its response to Defendant's objections, the agents would have taken the dropped bag into custody to inventory its contents before securing it. They would not have left it lying on the ground in plain sight. (Dkt. 115 at 3 (quoting *United States v. Rhind*, 289 F.3d 690, 694 (11th Cir. 2002) (holding that even if protective search of a bag in defendant's possession was unlawful, "the contents of the bag would nevertheless have been admissible because the officers inevitably would have discovered the evidence in a routine inventory search following [defendant's] arrest")).) The Court thus overrules Defendant's objection. Having reviewed the evidence presented de novo, the Court agrees with Magistrate Judge Larkins's conclusion. Even assuming the initial detention was an unlawful arrest, the inevitable discovery exception applies to the exclusionary rule. The Court denies Defendant's motion to suppress.

### 2.   Motion to Suppress Statements as Fruit of the Poisonous Tree

The Magistrate Judge next recommends the suppression of statements Defendant made to officers prior to his "formal" arrest, as fruit of an unlawful arrest. (Dkt. 107 at 30.) Although Defendant does not identify with specificity the statements he wishes to suppress, the

Magistrate Judge deduced the only possibilities were (1) his response to a question about whether anyone else remained in the house and (2) his response to a question about whether he had identification.  (*Id.*)  And since the government maintained that Defendant's initial seizure was a lawful detention and so made no alternative arguments, the R&R recommended granting the motion to suppress the statements due to the "limited" argument provided by the parties.  (*Id.* at 33 ("[T]he Court cannot find that the government—which bears the burden of persuasion to show that these statements are otherwise admissible—has made a sufficient showing that Defendant's statements to SA Jackson are not tainted as fruit of the poisonous tree.").)

Unfortunately, the Magistrate Judge did not have the benefit of well-developed arguments, from either side, on this particular issue and so his analysis was constrained.  (*See* Dkt. 107 at 33.)  In its objections, however, the government has provided more detailed argument and persuaded the Court that Defendant's motion to suppress the statements should be denied.[4]

---

[4] Defendant declined to reply to the government's objections.

First, the government argues these statements need not be suppressed because Defendant made them in response to routine investigatory questioning prior to his formal arrest and they were not induced by or a direct result of the unlawful "poison." (Dkts. 101 at 27–30; 112 at 7.)  The government also contends that the statement about who remained in the house should not be suppressed because it technically was asked seven seconds *before* the "poisonous" act of Trooper Ennis going into Defendant's pockets.  (Dkt. 112 at 6.)  The Court finds these objections well-taken and denies the motion to suppress.

After a review of the bodycam footage, the Court agrees with the government that Defendant's answer to the question about who remained in the house should not be excluded.  The R&R found that Trooper Ennis's digging in Defendant's pockets to be the "metaphorical poison" making it an unlawful arrest.  But agents asked Defendant whether there was anyone else in the house and he responded *before* Trooper Ennis touched Defendant's pockets.  Agents asked the question at approximately 00:17 of Trooper Ennis's bodycam footage.  (Dkt. 83-2, Ex. 5.)  Defendant then responded at 00:21, while Trooper Ennis was still handcuffing him.  (*Id.*)  And Trooper Ennis did not touch Defendant's

pockets and rummage through them — the ostensible "poison" — until 00:28. (*Id.*) The Court agrees that "[t]he fruit cannot come in time before the poison." (Dkt. 112 at 6.) And thus, the government has met its burden of persuasion to show shown that this statement is otherwise admissible. *See United States v. Kapperman*, 764 F.2d 786, 793 (11th Cir. 1985) ("[E]vidence that is not the 'fruit' of *prior* unlawful police conduct need not be excluded.") (emphasis added).

Defendant's other statement about his identification is likewise not subject to suppression. This is because it was both a routine booking question and because the unconstitutional action did not causally induce or result in Defendant's statement. Defendant's answer that he had identification and it was in his bag did not directly result from Trooper Ennis's improper search of his pockets. And because agents did not use any evidence obtained via the unlawful search to induce Defendant's responses, his statements are not "the direct result of the unlawful search and thus not a fruit of that search." *See United States v. Timmann*, 741 F.3d 1170, 1183 (11th Cir. 2013). No causal connection exists.

Further, the statement is an answer to a routine booking exchange, and thus not subject to suppression. *United States v. Sweeting*, 933 F.2d

14

962, 965 (11th Cir. 1991) ("An officer's request for 'routine' information for booking purposes is not an interrogation under *Miranda*, even though that information turns out to be incriminating."); *United States v. Sanchez*, 334 F. Supp. 3d 1284, 1302 (N.D. Ga. 2018) (denying motion to suppress defendant's statement concerning his nickname).

So as for these statements, the Court concludes the government has met its burden of demonstrating that neither was "obtained as a direct result of the illegal search." *Timmann*, 741 F.3d at 1182. The Court thus denies Defendant's motion to suppress his statements.[5]

## B.     Suppression of Cell Site Location Record Evidence

Finally, the R&R recommends denial of the motion to suppress the information gleaned as a result of the search warrant for the historical cell site information on the two cellphones seized from Defendant. (Dkt. 107 at 34.) This was after a discussion and review of the affidavit supporting the search warrant, which the Magistrate Judge "readily conclude[d]" establishes probable cause to believe that data — including historical cell site information — associated with Defendant's phones

---

[5] And the Court also notes, in agreement with the Magistrate Judge, that "while not raised by the government, it seems unlikely that either statement would be used at trial." (Dkt. 107 at 34.)

constituted evidence of criminal activity. (*Id.* at 40–41.)  He also concluded that it was "reasonable to believe that Defendant was involved in the trafficking of drugs and that the phones that were in his possession that day would contain data about the location or locations to which they traveled during the morning of March 28, presumably to retrieve additional cocaine for the drug transaction that afternoon." (*Id.* at 41.)

Defendant objects to this conclusion.  (Dkt. 111 at 11.)  But the Court finds his objection without merit.  The Court holds that a substantial basis existed within the four corners of the affidavit to establish a nexus between the thing to be searched (the data of cell site location information held by the mobile phone carrier) and the drug crimes for which Defendant was arrested.  As explained in Officer Harmon's sixteen-page affidavit, law enforcement specifically needed this information because Broadie and Defendant had left the house for a couple of hours that morning and were not under surveillance when Broadie allegedly picked up the drugs he later sold to the confidential informant.  (Dkt. 103-1 at 16, ¶ 34.)  The Court thus overrules Defendant's objection, adopts the R&R's recommendation, and denies the motion to suppress the cellphone records search warrant.

## IV.  Conclusion

The Court **OVERRULES** Defendant Carranza-Ontiveros's Objections to the Magistrate Judge's Report and Recommendation (Dkt. 111) and **SUSTAINS** the government's Objections to the Magistrate Judge's Report and Recommendation (Dkt. 112).

The Court **ADOPTS IN PART** the Magistrate Judge's Report and Recommendation (Dkt. 107).  Specifically, the Court **ADOPTS** the Magistrate Judge's recommendations regarding the suppression of physical evidence and cellphone location data, but **DECLINES TO ADOPT** the recommendations about the suppression of Defendant's statements.

The Court **DENIES** Defendant's Preliminary Motion to Suppress (Dkt. 71), his First Amended Motion to Suppress (Dkt. 97), and his Motion to Suppress Cell Phone Records Search Warrant (Dkt. 75).

**SO ORDERED** this 20th day of August, 2020.


_____
MICHAEL L. BROWN
UNITED STATES DISTRICT JUDGE